**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| WILLIE LEWIS, | Case No.: 2:08-cv-00157-RLH-PAL |
| Plaintiff, | **O R D E R** |
| vs. | (Motion for Summary Judgment–#15; Cross Motion for Summary Judgment–#21) |
| A. ENDELL, E.K. McDANIEL, JOE BRACKBILL, TONY JONES, ROBERT CHAMBLISS, and JOHN DOE, | |
| Defendants. | |

      Before the Court is Defendants Adam Endel, E.K. McDaniel, Joseph Brackbill, Tony Jones, and Robert Chambliss' **Motion to Dismiss/Motion for Summary Judgment** (#15) and errata thereto (#17), both filed August 29, 2008. The Court has also considered Plaintiff Willie Lewis' Opposition (#20), filed September 17, 2008, and Defendants' Reply (#23), filed October 1, 2008.

      Also before the Court is Plaintiff's **Cross Motion for Summary Judgment** (#21), filed September 17, 2008. The Court has also considered Defendants' Opposition (#24), filed October 6, 2008. Plaintiff did not file a reply.

//

1

**BACKGROUND**

In this 42 U.S.C. § 1983 action, Plaintiff Willie R. Lewis, an inmate in the custody of the Nevada Department of Corrections ("NDOC"), asserts three claims against officials at Ely State Prison for violating his Eighth Amendment right to be free from cruel and unusual punishment. First, he claims Defendants assigned him to an upper bunk, knowing he was epileptic, and as a result of their conduct, he was seriously injured when he fell from his bed during a seizure. Second, he argues Defendants provided inadequate medical treatment for the injuries he sustained as a result of the fall. Finally, he alleges Defendants temporarily discontinued his antiepileptic medication, causing him severe emotional distress.

Plaintiff was transferred from High Desert State Prison to Ely State Prison on August 15, 2006. He was initially assigned to a cell with a single lower bunk and was regularly given his antiepileptic medication, Dilantin. In December 2006, Plaintiff was transferred to a new cell and assigned the top bunk. Plaintiff alleges he told the escorting official there was a mistake because he was a seizure patient and was medically restricted to a lower bunk. The escorting officer told Plaintiff he had no knowledge of the restriction, but that he would talk to a senior officer about the situation. Tony Jones, the shift lieutenant, came to the cell and briefly discussed the situation with Plaintiff and his new cellmate. His cellmate explained he could not give up the lower bunk because he had glaucoma and was also restricted to the lower bunk. Jones purportedly told them all he could do was wait until morning and leave a message with the unit's caseworker, Robert Chambliss.

On December 6, 2006, Plaintiff spoke with Chambliss. While Plaintiff mentioned the lower bunk restriction, their conversation centered on Plaintiff's desire to have a non-smoking cellmate. Chambliss indicated he did not have much time to speak, but returned briefly after their conversation to give Plaintiff a slip stating NDOC was not obligated to house him with a non-smoker. The next day Plaintiff filed a written request explaining he needed a transfer because he

was medically restricted to a lower bunk. On December 8, Plaintiff received the request back on which Chambliss simply responded, "Noted."

On April 7, 2007, Plaintiff allegedly suffered a seizure and fell from his bed, injuring his shoulder, elbow, and knee, and causing pain in his neck and numbness in his fingers. According to Plaintiff, the corrections officers did not respond when he and his cellmate hit the call button. Plaintiff purports to have filed an informal grievance during the second week of April 2007, but he never received an answer to it. He filed another grievance on May 18, 2007. According to Defendants, Plaintiff was officially given a lower-bunk medical restriction on June 13, 2007, though he was not transferred at that time.

Plaintiff alleges he did not begin to feel the full effects of the pinched nerve and numbness until June 15 or 16, 2007. He again filed a written medical request on June 18 to see if the doctor could speed up the reassignment process. On June 28, 2007, Plaintiff filed an emergency grievance stating his urgent need to move to a cell where he could have the lower bunk because he lacked a place to sleep.

The situation came to a head on July 3, 2007, when Plaintiff attended the scheduled exercise hour. In the sally port, Plaintiff told the escorting officer he could not return to his cell because he was ordered to stay off the top bunk and he had no place to sleep. Plaintiff was written up for delaying, hindering, and interfering with the staff. Nonetheless Plaintiff was taken to the infirmary, where he remained for ten days before being transferred to a new cell with a lower bunk assignment.

After his reassignment, Plaintiff sought medical care for the injuries he sustained from his fall from the top bunk. Dr. Max Carter (Dr. John Doe in the Complaint) prescribed ibuprofen and steroid shots in his elbow and recommended he use hot towels to alleviate any pain. According to Plaintiff, this medical treatment was inadequate, given that later x-rays showed his shoulder blade was damaged and the bone was pushing into a nerve. Plaintiff argues Dr. Carter should have ordered x-rays and surgery.

1    In September 2007, Plaintiff's Dilantin prescription was discontinued.  Plaintiff
2  filed several written request to Joe Brackbill, the Director of Nursing, to find out the reason for the
3  discontinuance, but received no definite answer.  After going five days without his seizure
4  medication, Plaintiff began to panic and he filed a grievance in order to obtain a response.
5  Defendants state the doctor discontinued Plaintiff's medication because his blood work showed he
6  was not taking it.  Consequently, the doctor ordered the medication suspended to prevent a
7  possible suicide attempt with hoarded pills.
8    On October 17, 2007, Plaintiff was transferred back to High Desert State Prison.
9  After arriving, he again filed written medical requests about his injuries and medication.
10  According to Plaintiff, the doctor at High Desert allegedly x-rayed him, but did not follow up, and
11  eventually began to ignore his written requests.  The doctor did, however, reinstate Plaintiff's
12  seizure medication in December 2007.
13    In March 2008, Plaintiff was transferred to Nevada State Prison.  He was again
14  evaluated, this time by Dr. Snider Delmar.  Dr. Delmar allegedly treated Plaintiff for allergies and
15  then asked if there were anything else wrong.  Plaintiff told the doctor about his neck, elbow, and
16  shoulder and the numbness in his fingertips.  Dr. Delmar had Plaintiff perform a range of motion
17  examination, and after hearing several popping and clicking sounds, he told Plaintiff there was
18  definitely a problem, but that he could do nothing about it at that time.
19    Plaintiff was transferred back to Ely State Prison in July 2008.
20                                                                **DISCUSSION**
21    Both parties move for summary judgment on Plaintiff's three § 1983 claims in
22  which Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs in
23  violation of the Eighth Amendment's prohibition against cruel and unusual punishment.
24  **I.    Summary Judgment Standard**
25    A court will grant summary judgment if "the pleadings, the discovery and
26  disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 249 (1986). In evaluating a motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).

The movant bears the burden of showing that there are no genuine issues of material fact. *Id.* "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the movant satisfies the requirements of Rule 56, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**II.   § 1983 Claims**

42 U.S.C. § 1983 provides a mechanism for the private enforcement of substantive rights conferred by the Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). It is not itself a source of any substantive rights. *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979). Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction

1  thereof to the deprivation of any rights, privileges, or immunities secured by the
2  Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

3  42 U.S.C. § 1983 (2000).  To state a § 1983 claim, a plaintiff "must allege the violation of a right
4  secured by the Constitution and laws of the United States, and must show that the alleged
5  deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S.
6  42, 48 (1988).

7  Here, Defendants argue they are immune from Plaintiff's § 1983 claims in their
8  official capacities pursuant to the Eleventh Amendment and in their personal capacities pursuant to
9  the doctrine of qualified immunity.

10  **A.   Eleventh Amendment Immunity**

11  The Eleventh Amendment bars private party suits that seek to impose liability
12  which requires money be paid from the state treasury unless: (1) the State has waived its immunity
13  or (2) Congress overrides the States' immunity pursuant to section 5 of the Fourteenth
14  Amendment.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).  Congress enacted §
15  1983 pursuant to its section 5 powers, *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991),
16  but it did not abrogate the States' sovereign immunity, *Quern v. Jordan*, 440 U.S. 332, 341 (1979).
17  As such, "a State is not a 'person' against whom a § 1983 claim for money damages might be
18  asserted." *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 617 (2002).
19  Moreover, "a suit against a state official in his or her official capacity is not a suit against the
20  official but rather is a suit against the official's office." *Will*, 491 U.S. at 71.  "As such, it is no
21  different from a suit against the State itself." *Id.*  Consequently, State officials sued in their
22  official capacities for money damages are not persons for purposes of § 1983.  *Arizonans for*
23  *Official English v. Arizona*, 520 U.S. 43, 69 n.24 (1997).

24  Here, Defendants are NDOC employees and are thus state officials for purposes of
25  § 1983.  Plaintiff's claims for money damages against Defendants in their official capacities are
26  therefore barred by the Eleventh Amendment because they are no different from claims against the

AO 72
(Rev. 8/82)

State itself. Accordingly, Plaintiff's claims against Defendants in their official capacities are dismissed with prejudice.

### B.     Qualified Immunity

State officials sued in their personal capacity for money damages are not shielded by a State's sovereign immunity and are considered "persons" for purposes of § 1983. *See Hafer v. Melo*, 502 U.S. 21, 30–31 (1991). Nevertheless, state officials are entitled to qualified or "good faith" immunity from suits for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 815, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It is "an entitlement not to stand trial or face other burdens of litigation." *Id.* As such, the qualified immunity defense should be resolved at the earliest possible stage of the litigation. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court clarified the two-step inquiry a court must undertake when evaluating a qualified immunity defense. First, a court must determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* If a constitutional violation can be found, the court must then decide whether the right was clearly established. *Id.* "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202.

### 1.     Was There a Constitutional Violation?

Plaintiff alleges three violations of the Eighth Amendment's prohibition on cruel and unusual punishments, all relating to the conditions of his confinement. "In assessing claims that conditions of confinement are cruel and unusual, courts must bear in mind that their inquiries

'spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.'" *Rhodes v. Chapman*, 452 U.S. 337, 351 (1981) (quoting *Bell v. Wolfish*, 441 U.S. 520, 529 (1979)). But "[w]hen conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional rights.'" *Id.* at 352 (quoting *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974)).

### a. Lower Bunk Restriction

Plaintiff first claims Defendants were deliberately indifferent to his serious medical need when they assigned him to an upper bunk from December 2006 to July 2007 even though they knew he suffered from seizures. As a result, Plaintiff alleges he was severely injured when he suffered a seizure and fell from the top bunk on April 7, 2007. Defendants' opposition to this claim is that Plaintiff's allegations cannot be substantiated based on the grievance reports, which contain no mention of the fall until June 2007. But Defendants' opposition does not refute Plaintiff's allegations, it only challenges Plaintiff's credibility, which is a question of fact. Moreover, the Court is obligated at this stage to construe the allegations in the light most favorable to Plaintiff. *See Saucier*, 533 U.S. at 201. The Court finds that if Plaintiff's allegations are true, then he has alleged a constitutional violation, because "[p]rison officials have a duty to ensure that prisoners are provided adequate shelter . . . and personal safety." *Johnson*, 217 F.3d at 731.

### b. Inadequate Medical Care

Plaintiff also claims Defendants were deliberately indifferent to his serious medical needs because his treating doctors did not provide him with adequate treatment. "[D]eliberate indifference to an inmate's medical needs is cruel and unusual punishment [because] 'an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.'" *Rhodes*, 452 U.S. at 347 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Plaintiff claims that he suffered serious nerve damage as a result of his fall and that surgery, and not ibuprofen, steroid shots, or hot towels, was the proper treatment. Construing his

allegations in the most favorable light, Plaintiff has failed to assert a constitutional violation. Plaintiff states that doctors saw him repeatedly for his injuries. Plaintiff's claim is similar to that in *Estelle v. Gamble*, in which the plaintiff claimed the prison doctors violated the Eighth Amendment when they did not order an x-ray after he suffered a back injury. *See* 429 U.S. at 107. The Supreme Court's response in that case applies with equal force here: "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice." *Id.* Accordingly, Plaintiff's second claim fails to state a constitutional violation.

### c. Discontinuing Medication

Plaintiff's final claim is that Defendants were deliberately indifferent to his serious medical need when they temporarily discontinued his Dilantin medication. Defendants' explanation of why they withheld the medication demonstrates the doctors were not acting out of deliberate indifference to his medical need, but rather were responding to a serious medical concern. Defendants provide the affidavit of Karen Walsh stating that on September 25, 2007, the treating physician discovered that the amount of Dilantin in Plaintiff's blood was extremely low, indicating he was not taking his medication. The doctor therefore suspended the medication in order to prevent a suicide attempt with hoarded medication. Like Plaintiff's allegations of medical care, the doctor's decision to suspend Plaintiff's Dilantin prescription is a medical decision that, even if wrong, does not rise to the level of a constitutional violation. Thus, because Defendants were not deliberately indifferent in suspending his Dilantin prescription, Defendants' actions do not constitute cruel and unusual punishment.

### 2. Was the Constitutional Right Clearly Established?

The second step in the qualified immunity analysis is to determine whether the constitutional right Defendants violated was clearly established. "The relative dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

"This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Id.* at 201.

Here, the only constitutional violation is Plaintiff's claim Defendants acted with deliberate indifference to his serious medical need when they failed to reassign him to a lower bunk for seven months despite his medical history of seizures. In this instance, the Court concludes that the right was clearly established. Prison officials have been dealing with lower-bunk restrictions for many years now. *See, e.g.*, *Estelle*, 429 U.S. at 99 (doctor ordered prisoner moved from upper to a lower bunk to avoid injury). The reason for such restrictions are obvious: a prisoner could be seriously injured if he were to fall from the top bunk. This is precisely what occurred in this case. Moreover, a reasonable officer would understand this potential risk of serious injury. If Plaintiff's contentions are true, Defendants were deliberately indifferent when they refused to reassign him to a lower bunk, even though he was currently being treated for seizures, and when they housed him on an upper bunk for seven months. Accordingly, Defendants are not entitled to qualified immunity on this claim.

//
//
//
//
//
//
//
//
//
//
//

**CONCLUSION**

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss/Motion for Summary Judgment (#15) is GRANTED in part and DENIED in part as follows:

- Plaintiff's claims against Defendants in their official capacities are dismissed with prejudice.
- Plaintiff's first claim survives and Defendants' are not entitled to qualified immunity on that claim.
- Plaintiff's second and third claims are dismissed with prejudice because they do not state a constitutional violation.

IT IS FURTHER ORDERED that Plaintiff's Cross Motion for Summary Judgment (#21) is DENIED.

Dated: November 7, 2008.

_____
ROGER L. HUNT
Chief United States District Judge